

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-17-00565-CV

David **MORA**, Texas Sterling Construction Co. a/k/a Texas Crushed Concrete, and Sterling Construction Company, Inc. a/k/a Sterling Delaware Holding Company, Inc.,
Appellants

v.

Martin **VALDIVIA,** Sr. and Maria Cervantes Valdivia, both Individually and as Sole Heirs of the Estate of Martin Valdivia, Jr., Deceased,
Appellees

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CI09734
Honorable Michael E. Mery, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice
Dissenting Opinion by: Sandee Bryan Marion, Chief Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: July 17, 2019

AFFIRMED

This appeal arises from a personal injury suit filed after two constructions workers were traveling in their personal pickup truck, from San Antonio to Austin, immediately behind their foreman, and an unsecured toolbox fell out of their foreman's trailer. The workers stopped to retrieve the toolbox and were struck by a third vehicle; one worker was injured and the other was killed. Appellees, Martin Valdivia Sr. ("Martin Sr.") and Maria Cervantes Valdivia brought suit individually and as the sole heirs of the estate of their teenage son, Martin Valdivia Jr. ("Martin

Jr."). Appellees asserted claims for negligence and gross negligence against Appellants Texas Sterling Construction Co. ("Texas Sterling"), Texas Sterling's parent Sterling Construction Company, Inc. ("SCC"), and Texas Sterling's foreman David Mora (collectively, "the Sterling Appellants").

The jury found the driver of the third vehicle was neither negligent nor responsible for any percentage of responsibility for the accident. The jury also found Texas Sterling was grossly negligent based on an act or omission by Foreman David Mora and Safety Director José González. The jury awarded $9,543,000.00 in actual damages and $2,800,000.00 in exemplary damages.

On appeal, the Sterling Appellants contend the evidence is legally and factually insufficient to support the jury's findings that (1) Martin Sr. and Martin Jr. were not in the course and scope of their employment at the time of the accident; (2) the driver of the third vehicle was neither negligent nor partially responsible for the accident based on the defense of sudden emergency; and (3) Texas Sterling was grossly negligent based on an act or omission by David Mora and José González. The Sterling Appellants also contend the trial court erred in admitting the police accident report while redacting portions of the same and excluding portions of San Marcos Police Officer Jeremy Sembera's testimony. We affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Prior to jury selection, the Sterling Appellants conceded that Texas Sterling, SCC, and Mora were responsible for the accident and stipulated to their negligence alleged in the appellees' petition; therefore, the jury only determined negligence as to Norberto Ruelas Reyes. Texas Sterling and SCC also stipulated to their negligence in failing to establish a cargo securement

policy and failing to properly train their employees.[1]  Therefore, we limit our summary of the evidence to that necessary to the disposition of the issues on appeal.

## A.    The Accident

Martin Sr. and Martin Jr. (the Valdivias) worked for Texas Sterling installing bridges, sidewalks, and driveways.  David Mora was the Valdivias' crew foreman.

Texas Sterling, the subcontractor on an Austin highway construction project (the "MoPac project"), assigned Mora's crew to perform the work.  Each week, the crew traveled to Austin on Monday morning and returned to San Antonio on Friday or Saturday.  Texas Sterling provided crew members hotel rooms and a per diem.  Texas Sterling provided transportation for crew members in a company van; alternatively, crew members could opt to ride with Mora in his company pickup truck or drive their personal vehicles to Austin.  All crew members were paid an hourly wage based on hours worked at the job site; crew members were not paid for travel time or personal travel costs, such as gas, mileage, or auto insurance.  Employees' travel plans and routes were not controlled by Texas Sterling; the sole requirement was that employees arrive at the jobsite at 7:00 a.m., when their shift began.

### 1.    The Accident

On January 19, 2015, the second week of the MoPac project, in the early morning hours, Martin Jr. and Martin Sr. elected to drive in Martin Sr.'s personal Ford F-150 pickup truck. Although not required to do so by Texas Sterling, Martin Sr. elected to meet Mora at the Texas Sterling San Antonio yard and follow him to Austin.  Mora was towing a flat-bed trailer containing

---

[1] Prior to selection of the jury, the Sterling Appellants' counsel stipulated as follows:
> "[W]ith regard to the defendant [Texas Sterling] and SCC, . . . there will not be a contention that they were not negligent in the way that they set up policies for cargo securement, for the failure to train that is also alleged in the case, or that those actions by those parties were the actions of vice principals of the company or authorized or ratified by the company."

a large, 400-pound, eight-foot by four-foot by three-foot, empty, wooden toolbox. Mora constructed the toolbox out of Texas Sterling material to hold shovels, wood, saws, and other materials. The trailer also contained loose boards, bricks, and other materials.

Martin Sr. was following Mora, at approximately sixty-five miles-per-hour, in the middle lane of traffic on Interstate Highway 35 North, at approximately 5:52 a.m., when the toolbox fell from Mora's trailer. Martin Sr. pulled over to the emergency shoulder on the right side of the roadway, exited his pickup truck, and attempted to retrieve the toolbox. Martin Jr. also exited the pickup truck. A white van swerved to avoid the toolbox and came to a stop in the left shoulder lane. A Chevy Tahoe, driven by Reyes, originally swerved to the left to avoid the toolbox, but upon seeing a person, turned to the right. Reyes clipped the corner of the toolbox, and collided with Martin Sr.'s truck, injuring Martin Sr. and killing Martin Jr. on impact. As vehicles continued to try and avoid the toolbox, a vehicle struck the white van in the left emergency lane and two eighteen-wheelers "pulverized" the wooden toolbox.

*2.      The Investigation*

As San Marcos Police Officer Daniel Cook was traveling home after his shift that morning, he drove by the scene less than a minute after the accident. Officer Jeremy Sembera and Commander Christopher Tureaud relieved Officer Cook and took over the investigation. The officers interviewed witnesses, took photographs and measurements, and ultimately concluded Mora's unsecured toolbox was the contributing cause of the accident.

At trial, Mora explained, "I thought—we thought we'd nailed [the toolbox], but we never strapped it down. We never strapped it." Mora further testified he worked on several jobsites for Texas Sterling and was never informed by the superintendent, or any other Texas Sterling or SCC supervisor, "that nailing [was] the inappropriate use of a securement with a box because it can come out when you're traveling down the roadway." Although Mora understood, by the time of

trial, such methods were unacceptable, he did not know the toolbox was improperly secured at the time of the accident. Mora also acknowledged the trailer lacked a rear tailgate to prevent items from falling off the back and that he did not attempt to secure any other materials in the trailer. Texas Sterling never provided any training regarding installation of items or securement on a trailer. Mora further testified the only "securement securing" policy he remembers seeing or signing for Texas Sterling was after the accident.

Texas Sterling and SCC sent a team of officers and supervisors to the scene consisting of (1) José González, Texas Sterling's Corporate Safety Director and SCC's Safety Professional; (2) Rob Mitchell, Texas Sterling's Division Safety Manager; (3) Nick Kakasenko, SCC's Vice President of Safety and Health; (4) Greg McVey, Texas Construction's Vice President of Safety Issues; and (5) Clint Warren, Texas Sterling's South Texas Operations Manager. Based on their investigation, interviews, measurements, and photographs, the team "came to the conclusion that [the accident] was not work related, so we did not report" either Martin Jr.'s death or Martin Sr.'s injuries to OSHA.

> [W]e went through all the different scenarios, when it happened, where it happened, where they were going, and we determined that it was a work—that it was not a work-related incident.

Additionally, González testified that, in his position as corporate safety director and safety professional, he was "the professional who [made] those determinations for the company that—whether an employee is or is not in the course and scope of their employment."

Although the same team notified Texas Sterling's risk management department of their determination of course and scope of employment, Texas Sterling still reported the "on-the-job" claims to its workers' compensation carrier, Hartford Insurance Company. Hartford denied the claims because the Valdivias were "traveling to and from work," a noncompensable claim under the Workers' Compensation Act. Texas Sterling did not appeal Hartford's determination. Several

supervisors, including González and Kakasenko, testified they agreed with Hartford's determination the Valdivias were not in the course and scope of their employment at the time of the accident.

## C.    The Charge of the Court

The first issue before the jury was whether the Valdivias were in the course and scope of their employment with Texas Sterling at the time of the accident on January 19, 2015.  The jury found they were not in the course and scope of their employment at the time of the accident.

The second issue before the jury was negligence.  The Sterling Appellants conceded negligence as to Texas Sterling, SCC, and Mora; however, the jury was asked to determine whether Reyes, the driver of the Chevy Tahoe, proximately caused the accident.  The jury answered "No." The jury was also asked to apportion percentages of responsibility to those parties found to have caused or contributed to the accident.  Over the Sterling Appellants' objection, the trial court included an instruction on "sudden emergency."  The jury found Reyes did not bear any percentage of responsibility and apportioned the liability as follows: Texas Sterling 65%, SCC 30%, Mora 5%, and Reyes 0%.  Lastly, the jury found the harm to Martin Sr. resulted from the gross negligence of Mora and González and that their gross negligence was attributable to Texas Sterling.

The jury awarded $9,543,000 in actual damages and $2,800,000 in exemplary damages. This appeal ensued.

On appeal, the Sterling Appellants contend (1) the evidence is legally and factually insufficient to support the jury's findings on course and scope of employment, defense of sudden emergency, and gross negligence; and (2) the trial court erred regarding evidentiary rulings that singularly or cumulatively resulted in harmful error.  We affirm the trial court's judgment.

We turn first to the Sterling Appellants' legal and factual sufficiency claims regarding whether the Valdivias were in the course and scope of their employment and whether the defense of sudden emergency supported the jury's finding regarding Reyes.

LEGAL AND FACTUAL SUFFICIENCY CLAIMS

The Sterling Appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings that (1) the Valdivias were not in the course and scope of their employment at the time of the accident and (2) Reyes was neither negligent nor partially responsible for the accident based on the defense of sudden emergency.

**A.      Standard of Review**

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a legal sufficiency challenge, an appellate court "view[s] the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. Evidence is legally insufficient when the record discloses

> (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of a vital fact.

*Id*. at 810 (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)); *accord Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 736 (Tex. 2018). An appellate court considers all evidence, regardless of the offering party, "in the light most favorable to the party in whose favor the verdict has been rendered." *Hill*, 544 S.W.3d at 736 (quoting *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

In a factual sufficiency review, an appellate court considers all the evidence supporting and contradicting the jury's finding. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016). Where the proponent of the evidence receives an adverse ruling, we set aside the jury's verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *accord Crosstex N. Tex. Pipeline*, 505 S.W.3d at 615; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). As long as the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

Whether reviewing the legal or factual sufficiency of the evidence, the jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony and may choose to believe some witnesses and not others. *Id.* at 819.

**B.      "Course and Scope" Analysis**

The Sterling Appellants argue Appellees' claims for common law remedies are barred because their injuries were sustained in the course and scope of their employment.

*1.      Texas Workers' Compensation Act*

The Texas Workers' Compensation Act ("Act") provides:

> Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee.

TEX. LAB. CODE ANN. § 408.001(a). "Historically, this exclusive remedy provision has provided a legislatively-crafted compromise that relieves employees of the burden of proving negligence to obtain relief for workplace injuries but, in return, they forego any remedies except as may be provided in the Act." *Aguirre v. Vasquez*, 225 S.W.3d 744, 750–51 (Tex. App.—Houston [14th

Dist.] 2007, no pet.). "Workers' compensation insurance compensates employees who sustain compensable injuries." *Am. Cas. Co. of Reading, Pa. v. Bushman*, 480 S.W.3d 667, 673 (Tex. App.—San Antonio 2015, no pet.) (citing *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 519 (Tex. 2007)). "'Compensable injury' means an injury that arises out of and in the course and scope of employment for which compensation is payable under this subtitle." TEX. LAB. CODE ANN. § 401.011(10).

> The Act defines "course and scope of employment" as:
>
> an activity of any kind or character that has to do with and originates in the work, business, trade, or profession of the employer and that is performed by an employee while engaged in or about the furtherance of the affairs or business of the employer. The term includes an activity conducted on the premises of the employer or at other locations.

*Id.* at § 401.011(12); *accord SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 642 (Tex. 2015); *Bushman*, 480 S.W.3d at 673. If, however, the conduct falls within an exception to one of these elements, the employee's actions are not in the course and scope of his employment. Because commuting to and from work are the type of risks shared by the traveling public, and do not generally arise from a specific trade or profession, an injury sustained while commuting is generally not a compensable injury arising out of an individual's course and scope of employment. *See SeaBright Ins. Co.*, 465 S.W.3d at 642.

To prevail on a course and scope claim, a party must show the injury "(1) relate[d] to or originate[d] in, *and* (2) occur[ed] in the furtherance of, the employer's business." *Id.* at 642 (emphasis added) (quoting *Leordeanu v. Am. Prot. Ins. Co.*, 330 S.W.3d 239, 242 (Tex. 2010)). Courts generally employ a fact-intensive analysis and "[n]o singular fact is necessarily dispositive." *Zurich Am. Ins. Co. v. McVey*, 339 S.W.3d 724, 730 (Tex. App.—Austin 2011, pet. denied); *see also SeaBright Ins.*, 465 S.W.3d at 642–43.

We turn first to whether the Valdivias' injuries originated in Texas Sterling's business.

*2.     Origination*

All employees must necessarily travel to and from work; such travel "makes employment possible." *Leordeanu*, 330 S.W.3d at 242; *accord Seabright Ins. Co.*, 465 S.W.3d at 642. "[B]ut such travel cannot ordinarily be said to originate in the business, . . . because '[t]he risks to which employees are exposed while traveling to and from work are shared by society as a whole and do not arise as a result of the work of employers.'" *Leordeanu*, 330 S.W.3d at 242 (third alteration in original) (quoting *Evans v. Ill. Emp'rs Ins. of Wausau*, 790 S.W.2d 302, 305 (Tex. 1990)); *accord Seabright Ins. Co.*, 465 S.W.3d at 642. "[A] distinction can be made if 'the relationship between the travel and the employment is so close that it can fairly be said that the injury had to do with and originated in the work, business, trade or profession of the employer.'" *Seabright Ins. Co.*, 465 S.W.3d at 642 (quoting *Shelton v. Standard Ins. Co.*, 389 S.W.2d 290, 292 (Tex. 1965)). The examination focuses on whether the travel resulted from an express or implied condition of the employee's employment. *See id*. (citing *Meyer v. W. Fire Ins. Co.*, 425 S.W.2d 628, 629 (Tex. 1968)). An appellate court undertakes a fact-based analysis considering "the nature of the employee's job, the circumstances of the travel, and any other relevant facts." *See id*. at 643.

*3.     Arguments of the Parties*

The Sterling Appellants raise several arguments regarding origination. First, Texas Sterling argues their company policy only pays for hotel accommodations beginning on Monday evening, but requires the Valdivias to be on the jobsite at 7:00 a.m., and the distance from San Antonio mandated the Valdivias travel to Austin early Monday morning. Second, under the continuous-coverage doctrine, the Valdivias were employees assigned on an atypical, out-of-town business trip where the company furnished food, provided accommodations, and required travel

on roads with which the driver may not be familiar. Third, the Valdivias were on a special mission for their employer.

Appellees counter the facts establish this was simply a case of two individual employees traveling to work to begin their workday.

*4.      Evidence Adduced at Trial*

The evidence surrounding the accident was uncontested.

Texas Sterling selected Mora's crew to work on the MoPac project in Austin. Although the record does not reflect that Mora's crew previously worked on any projects outside of San Antonio, the crew was part of Texas Sterling's South Texas Division, covering the geographic territory between Waco and Laredo. Texas Sterling provided temporary housing in Austin and each member of the crew received a $35.00 per diem for food. The Valdivias were injured while traveling from San Antonio directly to the job site in Austin; neither was injured while traveling between temporary housing and the job site.

Kevin Manning, Texas Sterling's National Risk Manager, testified the Valdivias were traveling in their own vehicle, and Texas Sterling did not pay a stipend for maintenance, service, insurance, or registration for the vehicle. Neither Valdivia was reimbursed for the time driving the vehicle, mileage, or gas. No designated route was required and the Valdivias were not required to follow Mora to the jobsite. Manning further verified the Valdivias were not required to wear steel-toed shoes, protective glasses, or other protective equipment while in the vehicle. The Valdivias were hourly employees; their time started at the jobsite at 7:00 a.m.; the accident occurred at 5:52 a.m., near San Marcos, Texas.

The Texas Sterling and SCC team of officers and supervisors at the scene determined the Valdivias were not in the course and scope of their employment. González, Texas Sterling's Director of Safety, testified he was the individual responsible for notifying OSHA, within eight

hours of an accident, regarding any fatalities or on-the-job employee injuries. At trial, González testified he and his team of supervisors concluded the accident was not work-related because neither Martin Sr. nor Martin Jr. was in the course and scope of his employment. González reiterated that he did not believe it at the time of the accident and he did not believe it at the time of trial. González testified he did not report the incident to OSHA, did not authorize Kakasenko to report the incident to OSHA, and he agreed with Hartford's determination denying workers' compensation benefits.

At trial, the Sterling Appellants relied on Manning's testimony, "in my opinion, [the Valdivias] were furthering our business by getting that box out of the roadway for us." Manning conceded that "[retrieving] company property from the middle of the highway" was not an assigned job and the Valdivias were traveling from San Antonio to Austin in route to a jobsite at the time of the accident.

### 5. *Analysis*

The Sterling Appellants argue Texas Sterling's South Texas division was based in San Antonio and worked on jobs in San Antonio. *See Bushman*, 480 S.W.3d at 675 (holding employee's travel to Elgin was in course and scope because it "was not merely a trip from home to a nearby job site to begin a regular workday, but rather was an atypical assignment in a different city"). The MoPac project was a Gulf Coast division project on which the San Antonio division was assisting, and crews were being sent from San Antonio. For Mora and his crew, traveling to Austin was an express condition of their employment. Based on the length of the commute, Texas Sterling provided hotel accommodations, a per diem for food, and various transportation options.

The Texas Supreme Court has long recognized "that an employee can have more than one fixed place of employment and that fixed place of employment can change according to the nature of his work." *Evans*, 790 S.W.2d at 304; *accord McVey*, 339 S.W.3d at 733. We must, therefore,

determine whether the Valdivias' travel was an atypical assignment or a special mission or whether the Valdivias were traveling to a "changed," "fixed placed of employment" as described in *Evans* and *McVey*. *See Evans*, 790 S.W.2d at 304; *McVey*, 339 S.W.3d at 733.

The Valdivias were assigned to work on the MoPac job. The testimony supports the crew members could choose to ride in a company-owned vehicle driven by a company employee, with Mora in a company-owned pickup truck, or by any other means. The only employee on Mora's crew who drove a company-owned vehicle was Mora. *See SeaBright Ins.*, 465 S.W.3d at 643; *Bushman*, 480 S.W.3d at 675. Texas Sterling paid the crew an hourly wage, the workweek ran from Monday morning at 7:00 a.m. through quitting time on either Friday or Saturday. The employees were paid a per diem and provided hotel accommodations. No employee, with the exception of Mora, was paid during their commute to work. The Valdivias were in their personal vehicle. Neither was reimbursed for mileage or other related expenses such as insurance or maintenance. *Compare Evans*, 790 S.W.2d at 304 (concluding not in course and scope of employment when railroad workers had to travel to a different location for a regular morning safety meeting) *and Newsom v. Ballinger Indep. Sch. Dist.*, No. 03-07-00022-CV, 2007 WL 2066185, at *5 (Tex. App.—Austin July 17, 2007, no pet.) (mem. op.) (concluding not in course and scope of employment when school basketball coach driving to the school complex for Saturday practice "was not traveling on a 'special mission' for the school district, nor was she traveling at anyone's direction or control"); *with SeaBright Ins. Co.*, 465 S.W.3d at 644 (concluding in course and scope of employment because employees were "more akin to those employees such as deliverymen, messengers, collectors, and others, who by the very nature of the work they have contracted to do are subjected to the perils and hazards of the streets."), *Bushman*, 480 S.W.3d at 675 (concluding in course and scope of employment when employee truck driver traveled from Seguin to Elgin for one week to train new employee as dispatcher; employer paid mileage, lodging, and travel

expenses), *Tex. Mut. Ins. Co. v. Jerrols*, 385 S.W.3d 619, 631 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd) (concluding in course and scope of employment when employees were paid during the lunch hour, required to stay together during lunch, eat at same restaurant, ride in company vehicle, driven by company employee, at location away from jobsite), *and McVey*, 339 S.W.3d at 731 (concluding in course and scope of employment when required to attend leadership training meeting, ordered to travel to Houston, provided vehicle and paid for expenses, different from regular safety meetings, and mandated manner of travel).

MoPac's jobsite being in Austin does not establish origination. Texas Sterling's directing the Valdivias to travel to an out of town jobsite does not establish origination. *See Evans*, 790 S.W.2d at 305. Their weekly employment began at 7:00 a.m. at the jobsite. Their travel was neither paid for nor reimbursed. Their route was not dictated. An employer's gratuitous offer of transportation does not establish origination. *See SeaBright Ins. Co.*, 465 S.W.3d at 644. Unlike in *Jerrols*, the Valdivias were not on a paid lunch hour, traveling in a company vehicle, to a mandated location, or for a set amount of time. *See Jerrols*, 385 S.W.3d at 632. Although Martin Sr. elected to follow Mora, Texas Sterling did not set any parameters on the route or mode of transportation. *Contra McVey*, 339 S.W.3d at 732–33 (establishing special mission when circumstances of the employee's trip were largely dictated by the employer's rules regarding carpooling and minimizing travel expenses). Mora's crew was required to be on the jobsite, Monday morning at 7:00 a.m. How each employee arrived at the jobsite was at the sole discretion of the employee. When the accident occurred, neither Martin Sr. nor Martin Jr. were on Texas Sterling's timeclock. The record is replete with Texas Sterling and SCC representatives, the individuals responsible for making such determinations, concluding that neither Valdivia was in the course and scope of his employment at the time of the accident.

Based on a review of the entire record, viewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence is legally sufficient to support the jury's finding that neither Martin Sr. nor Martin Jr. was in the course and scope of their employment. *See City of Keller*, 168 S.W.3d at 827. Additionally, considering all of the evidence supporting and contradicting the jury's finding, we conclude the jury's findings are "not against the overwhelming weight of the evidence as to be clearly wrong and unjust," and the evidence is thus factually sufficient. *See Crosstex N. Tex. Pipeline*, 505 S.W.3d at 615.[2]

We therefore overrule the Sterling Appellants' issue regarding course and scope of employment.

## C. Sudden Emergency

In their third issue, the Sterling Appellants argue the evidence is legally and factually insufficient to support the jury's finding that Reyes was neither negligent nor partially responsible for the accident based on the defense of sudden emergency.

### 1. Civil Practice and Remedies Code Chapter 33

Under Chapter 33 of the Texas Civil Practice and Remedies Code, the trier of fact must determine the percentage of responsibility of certain persons for the harm at issue. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a). The trier of fact—in this case, the jury—is afforded wide latitude in determining the negligent parties' proportionate responsibility. *See Jackson v. Williams Bros. Constr. Co.*, 364 S.W.3d 317, 325 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). Even if the evidence could support a different percentage allocation, an appellate court may not

---

[2] Because the Valdivias' travel did not originate in their employment, we need not address the exclusions set forth in section 401.011(A), (B). TEX. LABOR CODE ANN. § 4401.011(A), (B); *SeaBright*, 465 S.W.3d at 645 ("Both the origination and furtherance elements must be satisfied even if an employee qualifies for one of the exclusion under subsections (A) or (B) (citing *Leordeanu*, 330 S.W.3d at 248)).

substitute its judgment for that of the jury. *See Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

In Question 3(d) of the jury charge, the jury answered "No" to whether the negligence, if any, of Reyes proximately caused the accident. In Question 4, the jury apportioned responsibility for causing or contributing to causing the accident as follows:

| | |
|---|---|
| Sterling Construction Company, Inc. | 30% |
| Texas Sterling Construction Co. | 65% |
| David Mora | 5% |
| Norberto Ruelas Reyes | 0% |

The Sterling Appellants argue the jury's finding that Reyes was not negligent and its assignment of 0% responsibility to Reyes is necessarily tied to the sudden emergency instruction in the jury charge.

### 2. Sudden Emergency

#### a. Elements of Sudden Emergency Defense

A sudden emergency instruction advises the jury that it need not place blame on a party if the evidence shows conditions beyond the party's control or the conduct of a non-party caused the accident in question. *Jordan v. Sava, Inc.*, 222 S.W.3d 840, 847 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (op. on reh'g) (citing *Dillard v. Tex. Elec. Coop.*, 157 S.W.3d 429, 432 (Tex. 2005)). The instruction's purpose, in an appropriate case, is to advise the jurors, "that they do not have to place blame on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question." *Id.* (quoting *Dillard*, 157 S.W.3d at 432). To warrant a sudden emergency instruction, the record must contain evidence of the following three elements:

(1) an emergency situation arose suddenly and unexpectedly;

(2) the emergency situation was not proximately caused by the negligent act or omission of the person whose conduct is under inquiry; and

(3) after an emergency situation arose that to a reasonable person would have required immediate action without time for deliberation, the person acted as a person of ordinary prudence would have acted under the same or similar circumstances.

*Id.* (citing *Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex. 1995)). "[I]f there is *any* support in the evidence for a sudden emergency instruction, the instruction is properly given." *Id.* at 847; *accord Dodson v. Muñoz*, No. 04-17-00409-CV, 2018 WL 3747748, at *3 (Tex. App.—San Antonio Aug. 8, 2018, no pet.) (mem. op.).

b. Evidence

Appellees relied heavily on the testimony of Dr. Jahan Eftekhar, an accident reconstructionist, to prove Reyes was neither negligent nor responsible for causing or contributing to causing the accident. The investigation conducted by Dr. Eftekhar's team included physically inspecting the accident scene; photographing and taking measurements; inspecting the vehicles; reviewing discovery materials, i.e., depositions, a videotape taken on the morning in question, police reports and photographs; and conducting analysis.

i. Evidence relied on by Dr. Eftekhar

For his analysis, Dr. Eftekhar relied on the statements of several of Texas Sterling and SCC's corporate representatives and supervisors.

Manning, Texas Sterling's National Risk Manager, explained "[Mora's] trailer has a warning on it. [The warning] talks about securement of the load because [the items] may fly out or fall off the trailer, and [Mora] violated that [warning], too." He testified that Mora violated good common sense in not properly securing the load. According to Manning, the accident took place because Reyes was "responding to an emergency situation caused by [Mora] failing to properly secure his load."

Nick Kakasenko, SCC's Vice President of Safety and Health, reported that "if the box was secured, this accident wouldn't have happened." Kakasenko further opined, that

> [N]obody else contributed to the accident except the toolbox falling off. The root cause of this occurrence was Mora's failure to secure the load, number one, failure of the superintendent to the property to supervise, and number three, lack of a policy in load securement.

Based on the internal investigation conducted by SCC and Texas Sterling, Manning, González, and Kakasenko, along with Robert Mitchell, Texas Sterling's Division Safety Manager, reached the unanimous conclusion the box had never been properly attached to the trailer, was not nailed down at all on the day of the accident, and that it was the root cause of the accident.

González, Texas Sterling's Director of Safety, testified Texas Sterling did not have either a written cargo securement protocol or a training program for its employees and allowed loose materials in the trailer. Although Mora testified he thought the toolbox was nailed to the trailer, the trailer bed did not have any nail holes; suggesting the toolbox was not, and had never been, nailed to the trailer. Regardless, Dr. Eftekhar explained, "[n]ailing is not a proper way of [securing the box to the trailer]. You have to bolt [the box] in because nails come out anyway." Dr. Eftekhar further explained improper cargo securement was a known hazard for more than a decade before the accident and Texas Sterling failed to take reasonable steps to implement a securement policy, train their employees, or properly supervise their employees.

Dr. Eftekhar reviewed the photographs, measurements, police officer reports, other witness statements, and the Coban dash camera video captured by Officer Cook driving by the scene almost immediately after the accident. Reyes provided two nearly identical statements. The statements were given in Spanish and translated into English. Reyes swerved to miss either the white van or the toolbox and in doing so struck Martin Sr.'s truck, injuring Martin Sr. and killing Martin Jr.

Commander Tureaud concluded the accident was "clear-cut" because "if the box hadn't have fallen off the trailer, this would not have happened."

ii.     The Four Sequential Events

Based on all of the measurements, photographs, and other evidence, Dr. Eftekhar made several conclusions regarding Mora's and Martin Sr.'s vehicles.

Martin Sr. saw the box suddenly start slipping off the back of the trailer when he pulled to the emergency shoulder of the roadway and was struck when he exited his truck. Martin Jr. was also struck exiting the truck. "[Dr. Eftekhar's] reconstruction show[ed] that [Martin Jr.] was out of the truck on the [passenger] side of their own truck on the grassy area."

Dr. Eftekhar opined four events occurred in the following order:

(1)     "[T]he toolbox falls out of the trailer, which was told by Mr. Mora."

(2)     "[T]he Tahoe clips the toolbox which is on the roadway and goes to the right and rear-ends a truck. Mr. Valdivia's truck is parked on the emergency shoulder."

(3)     "[A] blue Chevrolet truck rear-ends a white Chevrolet Express van. The Express van was in front of the Tahoe, was to left, and ends up in the shoulder—emergency shoulder on the left side, and this truck impacts that one on the shoulder."

(4)     "[T]he box, which is still on the roadway, it gets impacted by a tractor trailer that we see in the Coban."

iii.     Driver Expectancy

Dr. Eftekhar also testified regarding the theory of "driver expectancy"—all drivers must be prepared for the driver immediately in front to quickly apply the brakes to the vehicle. Some obstacles are expected, like cattle or deer on a rural road. Dr. Eftekhar further opined that a driver cannot reasonably expect a large toolbox in the middle of a state highway. Dr. Eftekhar explained the process requires an individual (1) to perceive a cue, i.e., a car, and (2) time to react, i.e., the braking, steering, or a combination of braking, accelerating, and steering.

- 19 -

Based on the statements, the pictures, the information taken from the vehicles, and the measurements at the scene, Dr. Eftekhar testified Reyes braked approximately 150 feet, or a little more than 1.8 seconds, before the box. To account for Reyes seeing the box, processing the box, and making a decision how to react, Dr. Eftekhar used the average number used by accident reconstructionists—1.5 seconds. Multiplying the time by 1.5 to determine feet per second, assuming Reyes was traveling seventy miles-per-hour, Dr. Eftekhar calculated Reyes was approximately 340 feet from the box when he first saw it. Dr. Eftekhar opined:

> the driver of the Tahoe, Reyes, perceived and reacted by braking and steering when he experienced a sudden and unexpected emergency, being either the white van in front or the—or the toolbox on the roadway. The emergency included an abrupt lane change by the white van and a non-conspicuous wooden toolbox laying in the middle of the dark, high-speed interstate highway. His decision of going to his right was very spontaneous after viewing the vehicle ahead making a sudden and unexpected emergency maneuver to its left. Reyes' actions were prudent and reasonable under the circumstances, which means clearly he took one side to go either left or right. Left already was a white van there. He went to the right. And he says that he saw someone walking or running on that side, so per his statement, that's why he made the decision to go to the right.

When asked whether a reasonably prudent person could have avoided the box given the circumstances of the roadway and the lighting, Dr Eftekhar explained,

> If you have the visual to see it and you demand to see it, then you can avoid it the way that the white van did, but it ended up in the emergency left side shoulder. If the white van was in front in a short distance, then what happens is what happened to Mr. Reyes. He has to make a quicker decision.

Dr. Eftekhar testified that determining whether Reyes was negligent or responsible requires considering numerous factors: lack of stability control, the nighttime conditions, travel at seventy-miles-per-hour, visibility, conspicuity, and an unexpected event. In his opinion, Reyes acted in a reasonable and prudent manner and was not negligent at the time of the accident.

c.    Analysis

The Sterling Appellants argue (1) "[a] box lying at rest on a highway does not by itself create a sudden emergency" unless there is evidence Reyes had no or little time to react to it; and (2) the only evidence of a sudden emergency is Dr. Eftekhar's testimony there would be no emergency unless Reyes was closely following the white van. The Sterling Appellants further contend Dr. Eftekhar's testimony is based on "nothing more than pure speculation and assumption."

The purpose of a sudden emergency instruction is to advise the jurors, that in certain situations, blame need not be placed "on a party to the suit if the evidence shows that conditions beyond the party's control caused the accident in question or that the conduct of some person not a party to the litigation caused it." *Dillard*, 157 S.W.3d at 432. Dr. Eftekhar testified he utilized several sources in reconstructing the accident and his theory of "driver expectancy" to explain why Reyes was not responsible for causing the accident. Dr. Eftekhar's concrete scientific data was fundamentally based on photographs and measurements from the scene of the accident.

Dr. Eftekhar also downloaded the data from the electronic black box in Reyes's Tahoe. From this data, Dr. Eftekhar was able to determine that prior to the accident, Reyes was traveling 69.3 miles-per-hour, below the 70 miles-per-hour speed limit, was "[m]ore likely than not" using cruise control, and first applied his brakes 1.8 seconds before hitting the toolbox. Although Dr. Eftekhar was unable to determine how closely Reyes was following the white van, the evidence that Reyes hit his brakes 1.8 seconds before hitting the toolbox is some evidence his following distance was reasonably prudent.

Based on a review of the entire record, viewing the evidence in the light most favorable to the jury's verdict, the record contains evidence from which the jury could reasonably have inferred (1) the wooden toolbox on the highway was sudden and unexpected, (2) that Reyes's actions prior

to the emergency were not a proximate cause of the collision, and (3) that the emergency, to a reasonable person, would have required immediate action without time for deliberation. We therefore conclude the evidence is legally sufficient to support the jury's finding that Reyes was neither negligent nor partially responsible for the accident. *See City of Keller*, 168 S.W.3d at 827. Additionally, considering all of the evidence supporting and contradicting the jury's finding, we conclude the jury's findings, that Reyes was neither negligent nor partially responsible for the accident, are "not against the overwhelming weight of the evidence as to be clearly wrong and unjust," and the evidence is thus factually sufficient to support the jury's findings. *See Crosstex N. Tex. Pipeline*, 505 S.W.3d at 615; *Jordan*, 222 S.W.3d at 852; *accord Gonzalez v. Cruz*, No. 13-07-351-CV, 2008 WL 2764565, at *4 (Tex. App.—Corpus Christi July 17, 2008, no pet.) (mem. op).

Having concluded the evidence was legally and factually sufficient to support the jury's verdict as to course and scope of employment and sudden emergency, we turn to whether the evidence is legally and factually sufficient to support the jury's finding of gross negligence against Texas Sterling.

**GROSS NEGLIGENCE**

The Sterling Appellants next argue the evidence is legally and factually insufficient to support the jury's finding that the harm to Martin Sr. resulted from gross negligence attributable to Texas Sterling based on the acts or omissions of David Mora and José González.

**A.      Elements Necessary to Prove Gross Negligence**

In *Boerjan v. Rodriguez*, the Texas Supreme Court explained that gross negligence requires a showing of two elements:

> (1)      viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(2)     the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed[s] in conscious indifference to the rights, safety, or welfare of others.

436 S.W.3d 307, 311 (Tex. 2014) (per curiam) (alterations in original) (quoting *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)).  Under the objective element, an "extreme degree of risk" means "'not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.'" *Id.* (quoting *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).  Under the subjective element, "actual, subjective awareness" considers whether "'the defendant knew about the peril, but its acts or omissions demonstrated that it did not care.'"  *Id.*  The defendant must know of the specific danger—not a generalized hazard.  *Ineos USA v. Elmgren*, 505 S.W.3d 555, 568 (Tex. 2016).  The integral difference between ordinary negligence and gross negligence is the subjective component of the defendant's state of mind.  *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246–47 (Tex. 1999).  "Circumstantial evidence may suffice to prove either element," so long as it is clear and convincing.  *Boerjan*, 436 S.W.3d at 311; *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008).

Therefore, to support a gross negligence claim, Appellees were required to prove Texas Sterling was aware that failing to implement a cargo securement policy and properly train their employees regarding safe cargo securement posed an extreme degree of risk, and had actual, subjective awareness of the risk involved in failing to implement a policy and/or training program, but nevertheless proceeded to allow their employees to travel with unsecured cargo with conscious indifference to Martin Sr.'s safety or welfare.  *See Telesis/Parkwood Retirement I, Ltd. v. Anderson*, 462 S.W.3d 212, 245 (Tex. App.—El Paso 2015, no pet.).

Because the Sterling Appellants concede that the unsecured toolbox created an extreme degree of risk, we limit our discussion to whether the evidence is legally and factually sufficient

to support the jury's finding regarding the second prong of the gross negligence test—the subjective element.

## B. Standard of review

Because gross negligence must be established by clear and convincing evidence, we apply a heightened standard of sufficiency review. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 138 (Tex. 2012). Under this heightened review, we must determine whether there was some evidence presented at trial that produces a firm belief or conviction of the truth of the allegation. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). The difference in applying an elevated test under the clear and convincing standard is that "a higher quality of evidence is necessary to tip the scales." *Id*. at 625.

When neither party objects to the questions submitted to the jury, we measure the sufficiency of the evidence against the actual jury charge submitted to the jury.[3] *Oliva v. Davila*,

---

[3] The trial court gave the jury the following gross negligence question and instructions:

Do you find by clear and convincing evidence that the harm to [Martin Sr.] resulted from gross negligence attributable to [Texas Sterling]?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegation sought to be established.

"Gross Negligence" means an act or omission by David Mora or José González,

1. which when viewed objectively from the standpoint of David Mora or José González at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2. of which David Mora or José González has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

You are further instructed that [Texas Sterling] may be grossly negligent because of an act by David Mora or José González if, but only if—

1. [Texas Sterling] authorized the doing and the manner of the act, or

2. [Texas Sterling] or a vice principal or manager of Texas Sterling ratified or approved the act.

A person is a vice principal if—

1. that person is a corporate officer; or

2. that person has authority to employ, direct, and discharge an employee of [Texas Sterling]; or

3. the person is engaged in the performance of nondelegable or absolute duties of [Texas Sterling]; or

373 S.W.3d 94, 101 (Tex. App.—San Antonio 2011, pet. denied) (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005)).  Although the Sterling Appellants' trial counsel objected to the instruction "on the grounds of no evidence," he expressly stated he had no objection to the form of the instruction.  Therefore, we review the sufficiency of the evidence to support the jury's finding that Texas Sterling was grossly negligent specifically based on the acts or omissions of David Mora and José González.  *See id.*

## C.      Argument of the Parties

The Sterling Appellants argue the record contains no evidence that either Mora or González was grossly negligent or that any acts committed by Mora or González are attributable to Texas Sterling.  Specifically, the Sterling Appellants argue there is no evidence of (1) Mora being subjectively and actually aware of the risk caused by the unsecured toolbox and consciously disregarded that risk or (2) González committing any act or omission prior to the accident.

Appellees counter that the evidence, including (1) Mora's failure to conduct required safety checks or follow manufacturer's instructions and (2) González's acknowledging that failing to secure loads results in thousands of accidents and creates a high risk of death, was legally and factually sufficient to support the jury's finding that Texas Sterling was grossly negligent.

---

4.  [Texas Sterling] has confided to that person the management of the whole or a department or division of the business of [Texas Sterling].

A person is a manager or is employed in a managerial capacity if—

1.  that person has authority to employ, direct, and discharge an employee of [Texas Sterling]; or

2.  [Texas Sterling] has confided to that person the management of the whole or a department or division of the business of [Texas Sterling].

A nondelegable and absolute duty of a corporation is the duty to provide rules and regulations for the safety of employees and to warn them as to the hazards of their position or employment.

Answer "Yes" or "No" for each of those below.

David Mora: _____

José González: _____

The jury answered "Yes" as to both David Mora and José González.

We address Texas Sterling's arguments regarding Mora and González separately.

**D.      Evidence Offered at Trial**

Because a corporation can only act through individuals, courts must distinguish between acts directly attributable to the corporation and acts solely attributable to the corporation's agents or employees. *See Ellender*, 968 S.W.2d at 921. A corporation may be grossly negligent if the corporation authorizes or ratifies its agent's gross negligence. *Id.* at 921. "A corporation is also liable if it commits gross negligence through the actions or inactions of a vice principal." *Id.* at 922. A vice principal may be (1) a corporate officer; (2) someone who has authority to employ, direct, and discharge other employees; (3) someone who performs the corporation's nondelegable or absolute duties; or (4) someone responsible for management of the corporation or its departments and divisions. *Id.* To determine whether an agent's or vice principal's acts are directly attributable to a corporate employer, we consider all the surrounding facts and circumstances, including reasonable inferences that can be drawn from the corporation's acts or omissions. *Id.*

   *1.      David Mora*

Although Mora testified he thought the toolbox was nailed to the trailer, Appellees argue there is evidence in the record that Mora knew the toolbox was unsecured. To support the jury's gross negligence finding, the evidence must demonstrate Mora knew the unsecured toolbox posed an extreme risk *and* that Mora consciously disregarded that risk. *See Boerjan*, 436 S.W.3d at 311. Our examination "focus[es] on [Mora's] state of mind, examining whether [Mora] knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others." *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012).

Mora testified he was never trained to secure the toolbox and no one from Texas Sterling ever informed him that his trailer was dangerous. *See U–Haul Int'l, Inc.*, 380 S.W.3d at 141 ("[A]

party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if they are wrong."). Mora testified it was not until *after* the accident that he learned nailing down the toolbox was an inappropriate means of safely securing it. *Cf. Garay v. G.R. Birdwell Const. L.P.*, No. 01-13-01088-CV, 2014 WL 6680347, at *11 (Tex. App.—Houston [1st Dist.] Nov. 25, 2014, no pet.) (mem. op.) (explaining company's failure to hold specific training on trench roller outweighed by employee's experience on trench roller, daily safety meetings, weekly handouts, and weekly handouts including one warning to never stand between equipment and fixed point). Mora admitted it was possible he believed the toolbox was simply heavy enough that it would not fall out of the trailer and did not need to be nailed down to be secure. Appellees do not identify any evidence contradicting this testimony or demonstrating that Mora understood the risk posed by the unsecured toolbox. *See Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 171–72 (Tex. 2005) (holding no evidence defendant was conscious that "compressor was unsafe as designed and operated"); *Andrade*, 19 S.W.3d 247–48 (holding employees' mistaken belief about whether electricity required disconnecting did not equate to conscious indifference). Absent evidence that Mora knew the unsecured toolbox posed an extreme degree of risk and proceeded in conscious disregard of that risk, we conclude the evidence is legally and factually insufficient to support a firm belief or conviction that Mora "knew about the peril, but [his] acts or omissions demonstrated that [he] did not care." *See U–Haul Int'l, Inc.*, 380 S.W.3d at 141; *Garza*, 164 S.W.3d at 627.

Accordingly, we conclude the evidence does not support a finding that Mora was grossly negligent or that any gross negligence on Mora's part is attributable to Texas Sterling. We next turn to whether the evidence supports the jury's gross negligence finding with respect to José González.

2.    *José González*

González was the Corporate Safety Director at Texas Sterling.  As a corporate safety director, he was ultimately in charge of safety at Texas Sterling.  At trial, González acknowledged that, on the issue of safety, the "buck" stopped with him.  Appellees contend that because González was a vice-principal responsible for management of Texas Sterling's Safety Department, Texas Sterling was responsible for González's actions or inactions amounting to gross negligence.  *See Ellender*, 968 S.W.2d at 921.

a.    Arguments of the Parties

As previously stated, the Sterling Appellants concede the unsecured toolbox involved an extreme degree of risk or harm to others.  However, the Sterling Appellants contend the record does not contain any evidence González committed any act or omission *before* the accident.  To the contrary, the only evidence of what González did, or did not do or know, was *after* the accident.

Appellees argue González's act or omission was his awareness of (1) the extreme risk posed by unsecured loads on the highways and roadways and (2) his failure, as Director of Safety at Texas Sterling and the person ultimately responsible for all safety issues at Texas Sterling, to implement policies and training regarding proper load securement for Texas Sterling's non-commercial drivers.

We therefore turn to González's "actual, subjective awareness of the risk involved." *See Boerjan*, 436 S.W.3d at 311.

b.    Actual Subjective Awareness of the Risk Involved

An appellate court's examination of the subjective component focuses on the individual's state of mind—whether the individual "knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others." *Reeder*, 395 S.W.3d at 796 (citing *Diamond Shamrock Ref. Co.*, 168 S.W.3d at 173).  Determining whether an act or

omission involves peril requires "an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Id*. at 796.

González testified the securement of a load is a safety issue. He acknowledged the securement of a cargo load is critical and a "big deal" since unsecured loads pose a high risk of death and result in thousands of accidents each year. González agreed that a reasonably prudent company must have a load securement policy to ensure that loads like a 300 to 400-pound toolbox on the back of a trailer are properly secured to a flatbed trailer; Texas Sterling did not have a policy that would have required the toolbox to be secured to the trailer. González further testified *this* accident was easily preventable (1) if Texas Sterling had implemented a load securement policy and procedures and (2) Mora had followed the procedures. *Cf. Diamond Shamrock Refinery Co., L.P.*, 168 S.W.3d at 171 ("Even though an FPU operator thought the check valve was leaking [and took no action to repair the leak], nothing in the evidence suggests that Diamond Shamrock actually knew [the leak] presented any danger of explosion [the resulting injury].").

The importance of properly securing a load was well-known in the industry prior to the accident. When asked by trial counsel, González acknowledged both he and Texas Sterling understood prior to the accident the reason load securement is so critical on roads and highways is "because unsecured loads pose an unreasonable risk of harm, injury or death to the motoring public." He further agreed that failing to secure loads causes a significant number of deaths on the highways.

Based on this evidence, we conclude a reasonable jury could believe the evidence was clear and convincing that González was actually and subjectively aware of the specific danger that an unsecured load posed to those traveling on the roads or highways. *See Sw. Bell Tel. Co.*, 164

S.W.3d at 627. We thus turn to whether González proceeded in conscious indifference towards the rights, safety, or welfare of others.

c.    Conscious Indifference towards the Rights, Safety, or Welfare of Others

At trial, González testified that, as Director of Safety, he was responsible for managing Texas Sterling's Safety Department. *See Ellender*, 968 S.W.2d at 922. As evidence, González testified the "buck stops" with him relating to safety issues. *See id*. González explained Texas Sterling employed Division Safety Managers and Safety Coordinators at different levels that reported to him; but at Texas Sterling, on issues of safety, as Corporate Safety Director, he was ultimately in charge of safety issues. *See id*.; *see also Telesis/Parkwood*, 462 S.W.3d at 250 (concluding director of facility and person responsible for testing and rendering emergency call system was vice-principal).

González testified Texas Sterling was responsible for the harm to Martin Sr. three ways: (1) failing to have a written protocol defining how to properly secure a load; (2) failing to have a formal training program relating to load securement; and (3) failing to institute protocols and procedures to ensure the training and proper load securement was taking place.

i.    Load Securement Requires Scientifically Developed Protocols

González originally testified load securement was a common-sense type risk assessment, and regardless of whether a policy was in place, their employees had enough training to assess the daily risks and know right from wrong. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 413 (Tex. 2009) ("[W]e do not impose a duty to train employees regarding the commonly-known dangers of driving while fatigued."); *Wilhelm v. Flores*, 195 S.W.3d 96, 98 (Tex. 2006) (per curiam) (holding that there is no duty to warn about dangers of bee stings). However, upon

further questioning, González changed his testimony and conceded cargo securement requires protocols setting out manners and procedures based on scientific calculations.[4]

### ii.      Load Securement Requires Actual Training

Pictures were admitted evidencing a large product warning sticker on Mora's trailer instructing the user to "secure your load." González acknowledged that without the proper training and written protocol, no method or manner existed or was available showing Mora how to properly secure the load, i.e., what type and the number of straps necessary, based on the load's weight and length. *See USA Truck, Inc. v. West*, 189 S.W.3d 904, 909–10 (Tex. App.—Texarkana 2006, pet. denied) (explaining that knowing behavior posed an extreme degree of risk, but nevertheless proceeding with the actions amounted to conscious indifference to the safety and welfare of others).

### iii.      Ensuring Compliance with Implemented Safety Measures

González failed to take steps to ensure employees followed the safety procedures implemented in the safety departments. *See Rayner v. Dillon*, 501 S.W.3d 143, 150–51 (Tex. App.—Texarkana 2016, no pet.). Safety measures included a Daily Focus Team Book wherein the foreman was required to fill out a daily description of the work to be performed, the basic steps, the potential hazards, and how to control the hazards. Before a trailer left the yard, part of the focus book, or task safety assessment, included a specific protocol setting out how the foreman

---

[4] The record is silent regarding any action taken by González, the Director of Safety, to implement additional procedures or policies to ensure no additional lives were placed at risk by Texas Sterling employees' improper cargo securement. In *Diamond Shamrock Refinery Co.*, 168 S.W.3d at 172, the Texas Supreme Court noted Diamond Shamrock's modifications after the explosion, to ensure another explosion did not occur, were further evidence that although Diamond Shamrock may have been negligent, the company did not act with conscious indifference.

> After the explosion, Diamond Shamrock modified the bleeder valves so that they could be used to check for liquids in the line, adding an extension to allow operation from a platform outside the building and a collection line to gather any contents. Its failure to make these modifications before the explosion may have been negligent, but again, this is not enough to prove gross negligence.

*Id*. At the time of trial, two years after the accident, the only policy implemented by Texas Sterling was "Secure your load." The policy was no different than the warning already on Mora's trailer at the time of the accident.

planned to reduce any potential hazards of serious injury or death transporting the day's materials. Texas Sterling safety procedures required the books be turned in daily and signed off by field management in the safety department. Mora's focus books, both before and after the accident, were not signed off by field management, indicating they were not reviewed by the safety department.

### iv. Analysis

Our analysis is two-fold: (1) whether González's acts or omissions are attributable to Texas Sterling and (2) whether González's acts or omissions constituted gross negligence.

*Gross Negligence Attributable to Texas Sterling*

According to González, on questions of safety at Texas Sterling, the "buck" stopped with him. Based on his testimony, and the testimony of the other Texas Sterling and SCC employees, we conclude that, as Director of Safety, González was the individual at Texas Sterling ultimately responsible for implementing the cargo securement protocols, training, and compliance procedures for Texas Sterling employees. We further conclude the record supports that González was "responsible for management of [Texas Sterling] or its departments and divisions;" and based on his responsibilities and duties, González was a vice principal of Texas Sterling. *See Ellender*, 968 S.W.2d at 921–22. As a vice principal of Texas Sterling, González necessarily approved his own acts or omissions.

> "[W]hen actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself," and "status as a vice-principal of the corporation is sufficient to impute liability to [the corporation] with regard to his actions taken in the workplace."

*Bennet v. Reynolds*, 315 S.W.3d 867, 884 (Tex. 2010) (alterations in original) (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)). We thus conclude the jury could reasonably infer that González was a vice-principal of Texas Sterling. *See Ellender*, 968 S.W.2d at 921–22.

*González's Acts or Omissions Constituted Gross Negligence*

The Sterling Appellants argue there is no evidence that González committed any act or omission. They further contend Appellees not only failed to prove González acted with gross negligence, individually, but Appellees also failed to prove Texas Sterling authorized, ratified, or approved grossly negligent acts, if any. We disagree.

González testified Texas Sterling was grossly negligent based on the following acts or omissions:

(1) although Texas Sterling was well aware of the risks and dangers associated with unsecured loads on roadways and highways Texas Sterling did not implement any policies for non-commercial drivers at Texas Sterling;

(2) Texas Sterling did not ensure any cargo securement training was implemented to show Texas Sterling employees, specifically David Mora, how to comply with manufacturers' cargo securement warnings and instructions, industry practices on securing cargo, or general good safety practices on proper cargo securement;

(3) Texas Sterling failed to ensure employees followed implemented safety measures, specifically the daily focus team books;

(4) Texas Sterling did not ensure employees followed the manufacturers' cargo securement warnings and instructions; and

(5) Texas Sterling did not know the necessary protocol or procedures relating to cargo securement.

The jury could conclude that the acts González attributes to Texas Sterling were "inarguably" his own acts. *See Bennet*, 315 S.W.3d at 884. The record contains clear and convincing evidence upon which the jury could form a reasonable belief or conviction that as the Corporate Safety Director, with twenty-five years' experience in the industry, *and* the individual ultimately in charge of safety, *and* a vice principal of Texas Sterling, the buck stopped with González. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 138; *Garza*, 164 S.W.3d at 627.

As head of the safety department, González bore the individual responsibility to ensure the necessary protocols, training, and compliance measures were implemented at Texas Sterling; his

failure to do so was grossly negligent. The jury could reasonably infer the acts of gross negligence to which González points as proof that Texas Sterling was responsible for the harm to Martin Sr., and the duties and responsibilities to which González testified, were, in fact, *the acts and omissions of gross negligence to which González was "ultimately responsible"* as Director of Safety. The evidence is therefore legally and factually sufficient to support the jury's finding that González had actual, subjective awareness of the risk involved in failing to implement cargo securement protocols, training, and compliance procedures at Texas Sterling. *See Boerjan*, 436 S.W.3d at 311.

We further conclude the record contains clear and convincing evidence upon which the jury could form a reasonable belief or conviction that given the high degree of risk of hauling an unsecured load on public roadways and highways, *and* González's authority as a vice principal of Texas Sterling, González's failure to implement the protocols, training, and compliance procedures amounted to a wanton disregard or conscience indifference to the safety of others. *See id.*; *Ellender*, 968 S.W.2d at 924–25 (concluding there was "legally sufficient evidence that Mobil vice principals had actual awareness of the extreme risk benzene exposure involves, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of Ellender and other contract workers"). The jury also could reasonably infer the acts of conscious indifference to the rights, safety, or welfare of others, to which González points as proof that Texas Sterling was responsible for the harm to Martin Sr., were, in fact, *the acts and omissions to which González was "ultimately responsible"* as Director of Safety. The evidence is therefore legally and factually sufficient to support the jury's finding that González failed to implement cargo securement protocols, training, and compliance procedures at Texas Sterling with conscious indifference to the rights, safety, and welfare of others. *See Boerjan*, 436 S.W.3d at 311.

Accordingly, we conclude the evidence is legally and factually sufficient to support the jury's finding that the harm to Martin Sr., resulting from González's gross negligence, was attributable to Texas Sterling. *See Garza*, 164 S.W.3d at 627.

Lastly, we turn to the Sterling Appellants' issues relating to the trial court's evidentiary rulings.

**EVIDENTIARY RULINGS**

The Sterling Appellants argue the trial court erred regarding three evidentiary rulings that singularly or cumulatively resulted in harmful error: (1) admitting portions of the police report including Officer Sembera's opinion that Mora was the cause of the accident, while simultaneously excluding portions of the report indicating Reyes was the cause; (2) excluding Officer Sembera's testimony that Reyes was a contributing factor; and (3) excluding Officer Sembera's testimony regarding the lack of eyewitness reports of a white van involved in the accident.

**A.      Standard of review**

"Evidentiary rulings are committed to the trial court's sound discretion." *City of San Antonio v. Kopplow Dev., Inc.*, 441 S.W.3d 436, 442 (Tex. App.—San Antonio 2014, pet. denied) (citing *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam)). "A trial court abuses its discretion when it acts without regard for guiding rules or principles." *Id.* (citing *U-Haul Int'l, Inc.*, 380 S.W.3d at 132). "Unless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). If erroneously excluded evidence was cumulative and not controlling on a dispositive issue, the error was likely harmless. *Kopplow Dev., Inc.*, 441 S.W.3d at 443 (citing *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008)).

**B.** **Police Accident Report and Officer Sembera's Testimony Regarding Reyes**

    *1.*     *Admissibility of Police Reports*

Absent circumstances indicating a lack of trustworthiness, accident reports setting forth the factual findings from an investigation in a civil case are admissible under Rule 803(8) as exceptions to the hearsay rule. *See* TEX. R. EVID. 803(8) (creating a presumption of admissibility); *see also 1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Capital*, 192 S.W.3d 20, 28 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *McRae v. Echols*, 8 S.W.3d 797, 800 (Tex. App.—Waco 2000, pet. denied) (explaining accident report may be admissible, but court may properly redact expert report). The rule also allows the admission of conclusions based on the factual investigation. *McRae*, 8 S.W.3d at 800. The party opposing the admission of a report under Rule 803(8) bears the burden to show the report's untrustworthiness. *1001 McKinney Ltd.*, 192 S.W.3d at 28.

    *2.*     *Offer before the Trial Court*

Officer Sembera testified he is not an accident reconstructionist and was "not being offered as an expert or reconstructionist"; he was tendered as a fact witness. Commander Tureaud testified that although he took picture and measurements, neither he nor anyone else in the San Marcos Police Department performed any accident reconstruction.

The trial court admitted Officer Sembera's accident report as follows: the narrative section remained in its entirety; the fact the unsecured load fell off the back of Mora's trailer remained because the parties were stipulating to that fact, any information like insurance or similar information was redacted, and any mention of "faulty evasive action" taken by Reyes's vehicle was redacted because "[m]aybe it was faulty . . . I'm sure both sides have their experts, so that's for the experts." Based on this ruling, the trial court also excluded Officer Sembera's deposition testimony that Reyes made a "faulty evasive action" that contributed to the accident.

*3.    Analysis*

The narrative section was properly admitted as a compilation of factual findings based on evidence collected by Officer Sembera and other officers at the scene of the accident. *See* TEX. R. EVID. 803(8)(C).   Included within the narrative section, Officer Sembera described the trailer attached to Mora's pickup truck as having "a large wooden toolbox on it that became dislodged and fell into the roadway."

a.    Contributing Factor Section

Immediately above the narrative section, Officer Sembera identified one contributing factor to the accident—Unit #1 [Mora's vehicle] and the contributing factor was #50 [unsecured load].   It was undisputed that an unsecured wooden toolbox fell of the back of Mora's trailer. González testified, in his opinion, the root cause of the accident was the failure to secure the toolbox and the toolbox falling off the trailer and landing on the highway.   González further testified he did not believe Reyes "did anything wrong" and the only contributing factor for this particular wreck was the toolbox coming off the trailer.   Kakasenko also testified, "No one questions the root cause of the accident was the improperly secured toolbox."

The failure of Mora's toolbox to be properly secured is a question of fact stipulated to by the defense.   Regarding the officer's conclusion on the unsecured load being a contributing factor of the accident, we conclude the Sterling Appellants failed to meet their burden to show the report's untrustworthiness. *See* TEX. R. EVID. 803(8)(B); *1001 McKinney Ltd.*, 192 S.W.3d at 28.   On the other hand, whether Reyes's evasive actions prior to the collision were "faulty" is an opinion. Officer Sembera was offered as a fact witness, not an expert or reconstructionist. *See Lopez-Juarez v. Kelly*, 348 S.W.3d 10, 21 (Tex. App.—Texarkana 2011, pet. denied) (explaining police officers generally not qualified to render expert opinions on accident reconstruction absent scientific training and expert qualifications).   We thus conclude the trial court did not err in admitting the

police report with Officer Sembera's identification of the unsecured load on Mora's vehicle as a contributing cause of the accident, while simultaneously redacting the officer's identification of Reyes's faulty evasive action as a contributing factor of the accident. *See* TEX. R. EVID. 803(8)(B); *1001 McKinney Ltd.*, 192 S.W.3d at 28.

      b.      <u>Officer Sembera's Testimony in Report Narrative or Deposition</u>

The trial court redacted any mention of "faulty evasion action" taken by Reyes's vehicle because "[m]aybe it was faulty . . . I'm sure both sides have their experts, so that's for the experts." *See McRae*, 8 S.W.3d at 800 (redacting portion of report containing expert opinion); *see also Lopez-Juarez*, 348 S.W.3d at 21; *cf. Rhomer v. State*, 522 S.W.3d 13, 19 (Tex. App.—San Antonio 2017), *aff'd*, 569 S.W.3d 664 (Tex. Crim. App. 2019) (explaining police officers are qualified if trained in the science about which they will testify and possess sufficient knowledge to qualify as an expert). "Whether a police officer is qualified depends on the facts of each case." *Lopez-Juarez*, 348 S.W.3d at 21.

Here, Officer Sembera testified he did not perform any scientific studies or tests in this case. Because the determination of whether Reyes's evasive action prior to the collision was "faulty" is an opinion, Officer Sembera was not qualified to testify regarding his opinion about Reyes's evasive action as a contributing factor, in the narrative section of the police report, or during his deposition. *See* TEX. R. EVID. 803(8)(B). We therefore cannot conclude that the trial court acted without reference to any guiding rules or principles in excluding the portions of the police report amounting to opinion testimony regarding causation. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 892 (Tex. App.—Texarkana 2004, pet. denied) (finding evidence inadmissible hearsay because officer was not expert in accident reconstruction).

**C.      Officer Sembera's Testimony Regarding the White Van**

The Sterling Appellants next contend the trial court erred by excluding the following portion of Officer Sembera's deposition testimony regarding the white van, which they argue is relevant to the sudden emergency defense:

Question:      Okay.  Were you ever told anytime by any of the people involved in this accident that the white—that the white van swerved to the left and Mr. Reyes didn't have time to react to the box?

Sembera:      No, sir.

Question:      Did anybody ever mention a white van that you recall?

Sembera:      Not that I recall, no, sir.

The trial court sustained the Appellees' objection based on hearsay.

*1.      Hearsay*

Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  TEX. R. EVID. 801(d).

The Sterling Appellants contend the testimony is the absence of a statement made during Officer Sembera's official duties in investigating the accident and, therefore, not hearsay. Appellees counter the excluded testimony was inadmissible hearsay—specifically Mora's and Reyes's statements to Officer Sembera at the scene.  *Contra* TEX. R. EVID. 801(e)(2) (excluding an *opposing* party's statement).

*2.      Analysis*

The statements about which Sterling Appellants complain, "Were you ever told anytime by any of the people involved in this accident that the white—that the white van swerved to the left and Mr. Reyes didn't have time to react to the box?" and "Did anybody ever mention a white van," are actually the absences of statements, which are not hearsay.  *See Warfield v. State*, No.

03-15-00468-CR, 2017 WL 2628563, at * 3 (Tex. App.—Austin June 14, 2017, pet. ref'd) (mem. op., not designated for publication). Hearsay requires an "out of court statement." *See* TEX. R. EVID. 801(a); *Warfield*, 2017 WL 2628563, at *3. "A 'statement' is (1) an oral or written verbal expression or (2) nonverbal conduct of a person, if it is intended by him as a substitute for verbal expression." *Murray v. State*, 804 S.W.2d 279, 283 (Tex. App.—Fort Worth 1991, pet. ref'd).

We conclude the challenged portion of Officer Sembera's testimony was not a statement that either Reyes or any other witness made to Officer Sembera. It was instead, evidence of the fact that neither Reyes nor any other witness actually made such a statement, neither statement was hearsay. *See* TEX. R. EVID. 801(a); *Warfield*, 2017 WL 2628563, at *3; *Murray*, 804 S.W.2d at 283. Accordingly, the trial court abused its discretion in excluding the statements about which the Sterling Appellants complain. *See Kopplow Dev., Inc.*, 441 S.W.3d at 442.

### 3. Improper Judgment

Reversal of erroneously admitted or excluded evidence is warranted only if the error probably resulted in the rendition of an improper judgment. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *U-Haul Int'l, Inc.*, 380 S.W.3d at 136 (citing TEX. R. APP. P. 44.1). An appellate court evaluates the entire record, considering the evidence as a whole, the role the evidence played within the trial, emphasis trial counsel placed on the evidence, the strengths and weaknesses of the case, and the jury's verdict. *U-Haul Int'l, Inc.*, 380 S.W.3d at 136 (citing *Sevcik*, 267 S.W.3d at 871; *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 883–84 (Tex. 2003)).

The jury saw photographs of the white van at the scene and the Sterling Incident Report referenced the white van. Multiple Texas Sterling supervisors and representatives testified Mora's failure to secure the toolbox was the sole cause of the accident. Dr. Eftekhar's testimony focused on Reyes's reaction to the swerving white van and whether his reactions to such contributed to creating a sudden emergency. Assuming the two statements in the eight pages of Officer

Sembera's deposition offered before the jury could be construed as contrary to that finding, considering the entire record, all of the witness testimony, the large number of exhibits, and the focus of the attorneys at trial, we cannot conclude the two statements resulted in the rendition of an improper judgment. *See U-Haul Int'l, Inc.*, 380 S.W.3d at 136.

## CONCLUSION

The Sterling Appellants raised four issues on appeal.

The Sterling Appellants argued the evidence was legally and factually insufficient to support the jury's determination that Martin Sr. and Martin Jr. were in the course and scope of their employment at the time of the accident. Our consideration of whether Martin Sr. and Martin Jr. were in the course and scope of their employment considered a review of the entire record, including but not limited to the facts that Martin Sr. and Martin Jr. were both hourly employees and their weekly employment began at the jobsite at 7:00 a.m. and finished when released on Friday or Saturday, their travel was neither paid for nor reimbursed, they were furnished a hotel and provided a per diem, they were not reimbursed mileage, insurance or other vehicle expense, and their route was not employer dictated. Additionally, the Texas Sterling team of supervisors and individuals responsible for making such determinations, determined Martin Sr. and Martin Jr. were not in the course and scope of their employment. Accordingly, we conclude the evidence is both legally and factually sufficient to support the jury's findings.

Although the Sterling Appellants did not contest the negligence of Mora, Texas Sterling, and SCC, the Sterling Appellants contend the evidence is legally and factually insufficient to support the jury's findings that Reyes was neither negligent nor partially responsible for the accident based on the defense of sudden emergency. The jury heard from several witnesses that Mora's failure to secure the cargo was the root cause of the accident. The record also included graphic pictures of the scene upon which the jury could rely. Additionally, the jury could have

reasonably relied upon the testimony of Dr. Eftekhar to infer the toolbox on the highway was sudden and unexpected and did not provide sufficient time for a reasonable person to deliberate. As such, we conclude the evidence is legally and factually sufficient to support the jury's findings that Reyes was neither negligent nor partially responsible for the accident based on the defense of sudden emergency.

The Sterling Appellants further contend the evidence is legally and factually insufficient to support the jury's finding that the harm to Martin Sr. resulted from the gross negligence attributable to Texas Sterling based on the acts or omissions of David Mora and José González. The Sterling Appellants conceded the unsecured toolbox created an extreme degree of risk, the objective element of gross negligence. Based on a review of the record, we concluded there was insufficient evidence to support that Mora understood the risk posed by the unsecured toolbox or that he proceeded in conscious disregard of that risk.

González, however, testified Texas Sterling was responsible for failing to have a written protocol defining how to properly secure a load, failing to properly train employees regarding load securement and the proper protocols, and failing to institute protocols and procedures to ensure the training and proper load securement were taking place. González also testified that as Texas Sterling's Corporate Safety Director, the buck stopped with him and he was ultimately in charge of all safety issues. By his own testimony, as head of the safety department, González was the individual responsible for Texas Sterling's safety program. He was a vice principal of Texas Sterling by definition.

González further testified that he understood the importance of cargo securement and the dangers associated with failure to properly secure cargo. He was ultimately the person responsible to ensure the protocols were written. He was also the person responsible to ensure the employees were properly trained in cargo securement—a safety issue. He was further the individual

responsible to ensure the same employees were following the written protocols and abiding by the training they received. As he testified, the "buck" stopped with him. The evidence is clear and convincing to support the jury's firm belief that the duties about which González testified were, in fact, the acts and omissions of gross negligence to which González was ultimately responsible as Corporate Safety Director. We therefore conclude the record contains clear and convincing evidence to support the jury's firm conviction that the harm to Martin Sr. resulted from the gross negligence attributable to Texas Sterling based on González's failure to implement the necessary protocols and training to ensure proper cargo securement.

Lastly, the Sterling Appellants contend the trial court erred in redacting any mention of Reyes as a contributing cause of the accident before admitting the police officer's accident report and excluding Officer Sembera's testimony based on hearsay. Because accident reports based on an officer's factual findings are admissible under Rule 803(8)(B) of the Texas Rules of Evidence, and Officer Sembera was not qualified as an expert to render his opinion before the jury, we conclude the trial court did not abuse its discretion in admitting the accident report. However, because the testimony regarding the white van was not hearsay, the trial court erred in excluding Officer Sembera's testimony. Nevertheless, we cannot conclude the two statements resulted in the rendition of an improper judgment.

Accordingly, we affirm the judgment in its entirety.

Patricia O. Alvarez, Justice